## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

WILLIAM F. MOSS,                      )
                                      )
              Plaintiff,              )
                                      )
vs.                                   )      Case No. 3:20-CV-107-MAB
                                      )
GABE SCHIMP, RYAN WARD, CURT          )
HUSTEDDE, AND MIKE CLEEK,             )
                                      )
              Defendants.             )

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on the motions for summary judgment filed by Defendants Mike Cleek (Doc. 56), Curt Hustedde (Doc. 60), and Gabe Schimp and Ryan Ward (Doc. 58). For the reasons explained below, Defendants' motions for summary judgment are granted.

### BACKGROUND

Plaintiff William F. Moss ("Moss") brings this civil rights actions pursuant to 42 U.S.C. § 1983 (Docs. 1 & 6). Following a threshold review of the Complaint pursuant to 28 U.S.C. § 1915A, Moss was permitted to proceed on the following claim:

**Count 1:**    Gabe Schimp, Ryan Ward, Curt Hustedde, and Mike Cleek subjected Plaintiff to unreasonable use of force in violation of the Fourth Amendment.

(Doc. 6).

On September 24, 2021, Defendants filed motions for summary judgment on the merits of Moss's claim (Docs. 56, 58, & 60). On November 2, 2021, Moss filed a response in opposition to Defendants' motions for summary judgment (Docs. 65).

### BACKGROUND[1]

In the early morning hours of January 31, 2018 – around 1:30 a.m. - firefighters arrived at the scene of a house fire in Harrisburg, Illinois (Doc. 57-6, p. 6-7). Hustedde, a police officer for the City of Harrisburg, Illinois, heard the fire call over the radio and responded to the scene (Doc. 58-1, p. 5 & 8). A teenage boy told Hustedde his sisters and mom were still inside burning house (*Id.* at p. 18-19). Onlookers "were trying to get into where the firemen were working," so Hustedde "started calling for backup…to try to hold the perimeter around the house while the firemen worked to put the fire out" (*Id.* at p. 9-10). The Harrisburg Fire Department also requested security from law enforcement (Doc. 57-2, p. 7, p. 8).

Schimp and Ward, police officers for the City of Eldorado (Doc. 58-2, p. 7) (Doc. 57-5, p. 5), and Cleek, a patrolman for the Illinois State Police (Doc. 57-2, p. 5), responded to the calls for assistance at the scene (Doc. 57-2, p. 7 & 10). When Cleek arrived, he witnessed two firefighters carrying a deceased adult female from the front door (Doc. 57-2, p. 9). Two children were still inside the burning home (*Id.* at p. 29 & 40).

---

[1] Defendants filed three motions for summary judgment, each with their own statement of facts and/or citations to evidence. In response, Moss filed one motion in opposition, which includes his own statement of facts. The background section here is derived from undisputed facts set out across the parties' briefing. A fact is undisputed if it is properly supported by citations to evidence and is not contested by evidence set forth by the opposing party.

Saline County Sheriff's Deputies Craig Williams and Lindsey Jones, numerous firefighters and EMTs, and onlookers including family members and friends of the deceased were also present at the scene (Doc. 57-2, p. 10) (Doc. 58-2, p. 10) (Doc. 57-8, p. 9) (Doc. 57-7, p. 7).

Members of the crowd were trying to run into the house, which was still on fire (Doc. 57-2, p. 11 & 28-29). In fact, Cleek described the fire as "raging" (Doc. 57-2, p. 28). There was also a propane tank near the burning home (Doc. 57-2, p. 29). Hustedde set up yellow tape around the house's yard that was in the vicinity of the street and sidewalk (Doc. 58-1, p. 11-13). The yellow tape was between 20 and 40 feet from the house and was marked with the words, "police tape, do not cross" (Doc. 57-5, p. 8) (Doc. 58-1, p. 11). Police officers formed a line to prevent people from running into the house to protect the fire department, preserve the scene[2], and keep everyone safe (Doc. 57-2, p. 11) (Doc. 57-7, p. 15). The officers stood inside the perimeter of the tape about halfway between the tape and the house (Doc. 58-1, p. 11). Ward and Schimp stood next to each other; Hustedde was several feet from Ward and Schimp; and Cleek was next to Hustedde (Doc. 58-1, p. 13-14) (Doc. 58-2, p. 14).

Meanwhile, Moss received news that his niece's house was on fire and that firefighters could not get her or her children out of the home (Doc. 57-1, p. 31). Moss "jumped up" and drove to his niece's house (*Id.*). When Moss arrived at the scene, he parked three or four blocks away, got out of his vehicle and ran towards the house while

---

[2] When someone dies in a fire, the State Fire Marshal performs an investigation, and firefighters are trained to preserve the integrity of the fire scene so the investigation can be properly conducted (Doc. 57-6, p. 24).

yelling, "Did they get them out yet?" (Doc. 57-1, p. 32). Moss crossed the police tape and ran in the direction of Ward and Schimp (Doc. 58-2, p. 13) (Doc. 57-5, p. 7) (Doc. 57-8, p. 15). Cleek heard Ward yell at Moss to stop (Doc. 57-2, p. 21-22). At that time, the house was still actively burning; the deceased woman's body was in the front yard and the firefighters were still trying to rescue and remove the two children from the burning home (Doc. 57-5, p. 9) (Doc. 57-2, p. 9 & 29). No one knew if the two kids were alive or dead (Doc. 57-2, p. 29).[3]

The parties dispute what happened next.

### A. Moss's Testimony

Moss testified that while he was running, four or five police officers tackled him to the ground like he "was playing football" (Doc. 57-1, p. 36-37). The first people Moss saw were the people that knocked him down (*Id.* at p. 33). However, Moss cannot identify which officers tackled him (*Id.* at p. 51). Moss named Cleek, Schimp, Ward, and Hustedde as Defendants because their names are in a report of the incident (*Id.* at p. 64-66). Moss physically felt all of the officers knock him down (*Id.* at p. 65). He says did not step in a hole (*Id.* at p. 71).

Once on the ground, Moss felt extreme pain in his right knee (*Id.* at p. 39). He did not have any problems with his knees before this incident (*Id.* at p. 23-24). He pulled his pantleg up and saw that his right kneecap was turned to the side instead of being straight (*Id.* at p. 126). Moss looked up and saw Cleek shining a flashlight in his face (*Id.* at p. 39).

---

[3] Unfortunately, it was later discovered that the children did not survive. *See* Doc. 57-2, p. 11).

Moss testified he told Cleek, "I cannot believe you guys just knocked me on the ground like this and will not help me up" (*Id.*). Moss says Cleek turned away and walked off, and Moss was left on the ground for 15 to 20 minutes before his family helped him up (*Id.* at p. 39 & 44-45). Moss told his sister, "[T]he police just broke both of my legs" (*Id.* at p. 43). Moss's sister brought the Assistant Chief of Police, Michael Riden, to the scene and he told Riden, "you guys just knocked me to the ground and broke both of my knees." (*Id.* at p. 44). Moss called David Morris, the former Chief of Police, the next day (*Id.* at p. 57). Moss says that Morris told him that Hustedde "attacked" him and was the only Harrisburg police officer that was involved in the incident (*Id.* at p. 57-59). But according to Moss, Morris never told him any specific acts Hustedde took on the date in question (*Id.* at p. 59). Nor can Moss recall a specific act Hustedde took (*Id.* at p. 62).

## B. **Schimp's Testimony**

Schimp testified he was standing in the police line when Moss began running towards he and Ward (Doc. 58-2, p. 13). Moss ran into Ward and then Schimp (*Id.* at p. 16). Schimp tried to block Moss like "an offensive lineman protecting his quarterback" (*Id.*). Ward "held him back" but Moss "kept going down the line trying to get through the line of officers" (*Id.*). Moss was "throwing elbows and cussing" (*Id.* at p. 18). Schimp says he never placed his arms around Moss (*Id.*). Nor did Ward ever get ahold of Moss's arms (*Id.* at p. 18). Moss's friends and family ran up and attempted to calm him down (*Id.* at p. 17). Ultimately, they let go of Moss and "[w]ithin a matter of seconds he just fell down" without anybody touching him (*Id.* at p. 20).

### C.  **Ward's Testimony**

Ward was wearing a body camera the night before and during the early morning

hours in question (Doc. 57-5, p. 6). However, Ward's camera was turned off during the

altercation with Moss (*Id.*). Ward testified:

> 2:00 was the end of my shift time, and the call came out at 2:30, and when I
> was not having functions with the public or anything, I had turned off the
> camera to conserve the battery life, because my camera was beeping after
> having it on for almost 12 hours prior to the incident. . .At the point in time
> when [Moss] came running in, exigent circumstances, he ran into the
> crowd, and the time that I realized it was safe to, that's when I turned it
> back on.

(*Id.* at p. 6-7).

Ward observed Moss running towards officers at a "high rate of speed" and he

ran into "two or three officers" (*Id.* at p. 10). The officers "had their hands up…pushing

him back to keep him from going from the fire" (*Id.* at p. 15-16 & 38). Ward approached

the altercation to help the others prevent Moss from passing the line (*Id.* at p. 10). Moss

was pulling away from one of the officers and Moss held Ward's right shoulder and

rolled into Schimp and other officers (*Id.*). Moss's family members or friends ran in and

pulled Moss back (*Id.* at p. 11). Moss struggled with his family and friends and "once he

got away, he fell on his own and fell on the ground" (*Id.*).

### D.  **Cleek's Testimony**

Cleek testified he saw Moss running towards the police line with his arms straight

forward (Doc. 57-2, p. 12-13). Moss hit Ward with his arms and pushed Ward's upper

body (*Id.*). Then, Moss collided with Schimp and Schimp put Moss "in a bear hug to try

to keep him in place" (*Id.* at p. 13-14). Ward rejoined the fray and grabbed Moss's arms

(*Id.* at p. 14-15). Cleek was 10 to 15 feet away from Schimp and Ward when Moss ran into the officers (*Id.* at p. 15). Cleek then ran towards Ward and Schimp to help, but when he had gotten there, Moss "abruptly sat down on his buttocks" with his legs "straight out" (*Id.* at p. 16). Cleek did not observe Hustedde or any other officer place their hands on Moss or remove Moss's legs from underneath him (*Id.* at p. 32).

### E. Hustedde's Testimony

Hustedde testified Moss ran into Ward and Schimp "like a bull, like a football player. . .just full force running into somebody" (Doc. 58-1, p. 20). Schimp was trying to hold Moss back in a "bear hug" (*Id.* at p. 21). Moss's friends were "pulling on him" (*Id.* at p. 23-24). Hustedde did not have any physical contact with Moss (*Id.* at p. 24). Hustedde did not observe any physical contact between Cleek and Moss (*Id.*). Moss disengaged the police officers and fell backwards to the ground (*Id.* at p. 27).

### F. Lindsey Jones's Testimony

Deputy Lindsey Jones testified she saw Moss attempting to run through the line of officers and falling, but she was too far away and it was too dark for her to see if the officers tried to stop him (Doc. 57-7, p. 18-19).

### G. Brockton Whitehead's Testimony

Brockton Whitehead is a firefighter who was at the scene (Doc. 58-7, p. 6). At the time of the incident with Moss, he happened to be on his hands and knees changing air bottles and saw four or five police officers holding a man back (*Id.* at p. 11-12). Whitehead testified that it is critical that no one interferes with a fire scene (*Id.* at p. 30). Interference can jeopardize the safety of firefighters, anyone in the structure, and the person

interfering (*Id.* at p. 31). Whitehead testified Moss was trying to interfere with the fire scene and that Schimp and Ward were protecting the firefighters and the people inside the fire (*Id.*).

Whitehead wrote a report, which indicates Moss was running and stepped in a hole (*Id.* at p. 12). Whitehead does not recall seeing Moss step in a hole (*Id.*). Whitehead authored the report, "in case something was to go wrong with this, one of the police officers or somebody has asked him if we could write one" (*Id.* at p. 13). Whitehead saw Moss walking away from the altercation with the police and another gentleman but does not recall Moss falling (*Id.* at p. 19).

### H. **Dr. Steven Young's Testimony**

On February 1, 2018, Moss presented to orthopedic surgeon Dr. Steven Young (Doc. 65-2, p. 5-7). Moss told Dr. Young he was in an altercation with police officers during which he was thrown to the ground (*Id.* at p. 7). On examination, Dr. Young found Moss had bilateral knee pain and swelling in both knees (*Id.* at p. 7). Moss was unable to extend his leg or knees (*Id.* at p. 7-8). An MRI from February 2, 2018 revealed a quadriceps tendon tear in Moss's left knee (*Id.* at p. 8). Dr. Young diagnosed Moss with a rupture of his right patellar tendon and a rupture of his left quadriceps tendon (*Id.* at p. 9).

Dr. Young testified he believed Moss's injuries could have been caused by the altercation with Defendants (*Id.*). Dr. Young opined within a reasonable degree of orthopedic certainty that is more probably true than not that Moss's injuries occurred as a result of external force being applied to the legs or knees (*Id.* at p. 11). Dr. Young opined it was "almost impossible" the injuries could have occurred while Moss was standing

still (*Id.* at p. 10). On February 5, 2018, Moss underwent surgery for both knees to repair the ruptured tendons (*Id.* at p. 9).

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court may not "choose between competing inferences or balance the relative weight of conflicting evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). Instead, "it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen*, 763 F.3d at 836.

## DISCUSSION

Defendants argue Moss's excessive force claim fails as a matter of law because Moss has not presented sufficient evidence that Defendants used unreasonable force. Alternatively, Defendants say they are entitled to qualified immunity.

### A. <u>Cleek and Hustedde</u>

Cleek and Hustedde argue summary judgment should be entered in their favor because Moss has no evidence they tackled him or caused his injuries. To hold individuals liable under § 1983, a plaintiff must establish the individual's "personal involvement in the alleged constitutional deprivation." *Minix v. Canarecci*, 327 F.3d 588, 594 (7th Cir. 2003). "[I]n light of § 1983's individual responsibility requirement, the plaintiff opposing summary judgment. . . must at a minimum have (1) pled a claim that plausibly forms a causal connection between the official sued and some alleged misconduct, *and* (2) introduced facts that give rise to a genuine dispute regarding that connection." *Colbert v. City of Chicago*, 851 F.3d 649, 658 (7th Cir. 2017) (emphasis in original). A plaintiff opposing a motion for summary judgment cannot rely on mere allegations and, instead, must set forth sufficient evidence to support his case. Fed. R. Civ. P. 56(e)(2); *see Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) ("Summary judgment is the 'put up or shut' up moment in a lawsuit").

Here, Moss testified he was "tackled" and "knocked down" by "four or five different people" (Doc. 65-1, p. 37 & 65), but could not identify the officers involved (Doc. 60-1, p. 49-51 & 65). Moss brought this suit against Cleek, Hustedde, Schimp, and Ward because they were named in incident reports of the altercation, which are not part of the record (*Id.* at p. 49-50 & 64). Cleek testified he was 10 to 15 feet away from Schimp and Ward when the altercation ensued (Doc. 57-2, p. 15 & 16). Moss does not dispute this account.

Hustedde testified he had no physical contact with Moss (Doc. 60-2, p. 24). Moreover, Moss conceded that he could not specifically identify any force Hustedde used against him (Doc. 60-1, p. 62). Moss recalled that after he was tackled to the ground, he looked up and saw Cleek shining a light in his face (*Id.* at p. 15-16).

Understandably, Moss may not be the most percipient witness to the events in question. However, Moss must still set forth evidence to create an inference that Cleek and Hustedde were personally involved in the violation of his constitutional rights. Moss cites *Azami v. Vill. of Wilmette*, 2016 WL 1298672 (N.D. Ill. Apr. 4, 2016) for the proposition that Moss does not need to identify which individual officer caused his injury. In *Azami*, the plaintiff brought claims for excessive force and failure to intervene but was unable to identify which defendants used force and which defendants failed to intervene. *Id.*  But this failure to identify which defendant used force against the plaintiff was not fatal to his case because of the failure to intervene theory, meaning that a defendant who did not use force could still be found liable for failing to intervene. *Id.* The Seventh Circuit has expressed the same principle on several occasions. *See, e.g., Miller v. Smith*, 220 F.3d 491 (7th Cir. 2000) ("If, as we are required to do at this point in the case, Miller's allegations are taken as true, whichever officer was not directly responsible for the beating was idly standing by. If Miller can show at trial that an officer attacked him while another officer ignored a realistic opportunity to intervene, he can recover. Since he alleges facts to support these claims, they should not have been dismissed."); *Sanchez v. City of Chicago*, 700 F.3d 919 (7th Cir. 2012) ("[I]t is possible to hold a named defendant liable for his failure to intervene vis-à-vis the excessive force employed by another officer, even if the

plaintiff cannot identify the officer(s) who used excessive force on him."). Here, Moss does not allege Hustedde or Cleek failed to intervene, so the reasoning of *Azami* is not applicable and does not affect Moss's burden of identifying evidence that Defendants were *personally* involved in the use of force.

Moss's case is more analogous to *Colbert v. City of Chicago*, 851 F.3d 649 (7th Cir. 2017). In *Colbert*, the plaintiff was arrested after a search of his apartment, and he brought suit for malicious prosecution, Fourth Amendment violations, and false-arrest. *Id.* at 652. During the search, Colbert was handcuffed and was not permitted to observe the search. *Id.* Colbert alleged that during the search, the officers caused damage to his property in the house. *Id.* at 652-53. However, he was unable to identify any of the officers who allegedly damaged his property. *Id.* at 653. Colbert sued four of the ten searching officers, who all denied causing any property damage. *Id.* at 657. The Seventh Circuit affirmed summary judgment in the defendants' favor because Colbert was unable to satisfy § 1983's personal-responsibility requirement. *Id.* at 657-58. The Seventh Circuit stated:

> We recognize the potential tension between § 1983's individual-responsibility requirement and factual scenarios of the kind present here: It may be problematic to require plaintiffs to specifically identify which officers caused property damage when officers commonly remove these individuals from the search area…We have indicated, however, that plaintiffs in this context can still satisfy § 1983's personal-responsibility requirement by including in their complaint allegations of misconduct that are unaffected at summary judgment by the inability to observe the search. For example, plaintiffs may allege that the named officers participated in something akin to a 'conspiracy of silence among the officers' in which defendants refuse to disclose which of their number has injured the plaintiff.
> . . .

Colbert…did not allege anything like a 'conspiracy of silence.' Nor did he do so in his Second amended Complaint, which he filed after learning that appellees had denied responsibility. And even if Colbert had alleged something like an illegal agreement among the named officers, he pointed to no evidence to support such misconduct. Without more, no jury could reasonably conclude that these particular defendants had any individual involvement in Colbert's alleged property damages. Thus, this claim does not survive summary judgment.

*Id.* at 657-58.

Similarly, here, Moss has not satisfied § 1983's personal responsibility requirement as to Cleek or Hustedde. Moss cannot rely on allegations and speculation to create a genuine issue of material fact at the summary judgment stage. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). Moss has not introduced sufficient evidence from which a jury could conclude Cleek or Hustedde had any personal involvement in the alleged use of excessive force. Although Cleek and Hustedde were present at the scene of the altercation, mere presence, without more, is not enough to satisfy the personal involvement requirement. *See Colbert*, 851 F.3d at 649; *Trout v. Frega*, 926 F. Supp. 117, 121 (N.D. Ill. 1996); *Nunez v. Dart*, 2011 WL 5599505, at *3 (N.D. Ill. Nov. 17, 2011). Further, Moss has not pleaded an alternative basis for liability, such as failure to intervene or a conspiracy of silence, that would be unaffected on summary judgment by Moss's failure to specify Hustedde and Cleek's personal involvement.[4]

---

[4] In his brief opposing summary judgment, Moss argues Defendants "knew that they had injured the Plaintiff and so they got together and agreed on what had happened" (Doc. 65, p. 6). Moss also contends that the lack of body camera footage indicates Defendants deleted favorable footage. But Moss has offered no evidence to support this contention. Moreover, Moss does not advance a claim for conspiracy of silence in his Complaint and "a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Anderson v. Donahoe*, 699 F.3d 989, 998 (7th Cir. 2012) (internal quotations and citations omitted).

With respect to Hustedde, Moss vaguely testified that the former police chief told him that Hustedde "attacked" him during the altercation. But this vague statement is hearsay, which is inadmissible in summary judgment proceedings to the same extent it is inadmissible at trial. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). The vague and inadmissible statement cannot be used to connect Hustedde to a specific illegal act.

In sum, Moss has failed to establish Cleek or Hustedde's personal involvement in the alleged use of excessive force. He did not advance any theory of liability such as failure to intervene against these two Defendants. Accordingly, both Cleek and Hustedde are entitled to summary judgment. However, as discussed below, even if Moss had evidence connecting Hustedde and Cleek's to a specific act, the alleged use of force was not unconstitutional. Alternatively, Defendants are entitled to qualified immunity.

**B.  Reasonableness of Force**

The Fourth Amendment prohibits the use of excessive force during the seizure of a person. *See United States v. Collins*, 714 F.3d 540, 543 (7th Cir. 2013). An excessive force claim is governed by the "objective reasonableness standard" set out by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. This test is "not capable of precise definition or mechanical application." *Id.* Instead, the analysis must focus on the "totality of circumstances" with consideration of "the

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The facts surrounding the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The determination must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Defendants do not contend Moss was committing a crime, resisting arrest, or attempting to evade arrest. However, they argue Moss posed an immediate threat to officers and firefighters, who were attempting to manage a deadly situation and forced to make split-second decisions. As set out in *Graham*, the Court must look to the totality of the circumstances through the eyes of a reasonable officer at the scene.

This story unfolds during the early morning hours of January 31st, 2018, when firefighters responded to a house fire, where an adult female and her two children were trapped inside. A crowd of onlookers gathered and began interfering with the firefighters' efforts to suppress the fire. Hustedde heard the fire call over the radio and was the first defendant to arrive at the scene. He witnessed members of the crowd attempting to run into the house, with the fire still raging. There was a propane tank near the house, which could have made matters worse at any second. Hustedde and the fire department called for backup to hold a perimeter.

Cleek, Schimp, and Ward responded to calls for assistance and eventually arrived at the scene. When Cleek arrived, he saw two firefighters carrying a deceased woman out through the front door. The two kids were still inside the home and it was unclear whether they were dead or alive. It was crucial that officers maintained the perimeter to protect the safety of onlookers and firefighters and preserved the integrity of the scene for the subsequent investigation.

There was yellow tape around the house in the vicinity of the street and sidewalk, which was marked "police" and "do not cross." Defendants stood between the tape and the house, inside the tape's perimeter. At some point, Moss arrived and ran towards the police officers and past the yellow tape. He was screaming, "Did you get them out yet" while he was running. Cleek heard an officer yell at Moss to stop but Moss continued running towards the fire and the police officers. When viewing the record in the light most favorable to Moss, Defendants then took Moss to the ground, which ruptured his right patellar tendon and his left quadriceps tendon.

The Court is mindful that summary judgment in excessive force cases "should be granted sparingly." *Abdullahi v. City of Madison*, 423 F.3d. 763, 773 (7th Cir. 2005).[5] However, this is a rare case in which no possible interpretation of the facts could support

---

[5] The Court is cognizant of the Supreme Court's directive that "[i]n general, courts should think hard, and then think hard again, before turning small cases into large ones" by addressing the merits of a constitutional claim instead of skipping to the qualified immunity question concerning clearly established rights. *Camreta v. Greene*, 563 U.S. 692, 707 (2011). However, deciding the constitutional question does not require "an uncertain interpretation of state law"; it does not appear "that the question will soon be decided by a higher court"; and the constitutional question has been briefed and is fairly obvious to the Court, so there is no "risk of bad decisionmaking." *Pearson v. Callahan*, 555 U.S. 223, 237-39 (2009). In light of the considerations identified in *Pearson*, a decision on the merits is appropriate in these circumstances.

a finding of excessive force. A reasonable officer, situated in Defendants' positions, could have determined that Moss posed an immediate threat to the officers, to himself, to the firefighters on the scene, and their efforts.

This was a tense and fluid scene. It was the early morning hours of January 31, 2018. A house fire was raging. One person had already perished in the fire and her body lay in the front yard. The firefighters were still searching for two children inside the burning home. There was a propane tank near the burning house that could have made matters worse in an instant. The crowd that had gathered was not exactly compliant as some members of the crowd had already attempted to run inside the burning home. So it is with this backdrop that Moss comes into the picture. He disregarded yellow police tape, ignored a command to stop, and ran towards a line of police officers who had formed a perimeter. In addition to the search and rescue effort that was ongoing inside the burning home, the firefighters were also working to suppress the fire and preserve the scene for investigation, which must be done anytime there is a death. A reasonable officer could have believed Moss was attempting to run into the burning house. If Moss had gotten past the officers and into the house or even close to the house, his own life and safety would have been in jeopardy. Moreover, if Moss had gotten past the Defendants and into the house, this could have jeopardized the safety of the firefighters. Moss could have also disrupted their search efforts for the two kids and their work in trying to put the fire out. If Moss had gotten past the officers and inside the home, this would have added yet another person for the firefighters to search for and remove from the burning home. Moss's behavior also risked compromising the integrity of the scene inside, where

a subsequent investigation would be required as a result of the deaths caused by the fire. The Defendants were faced with an incredibly dangerous situation that called for a quick decision. In response, Defendants utilized a takedown maneuver.

Defendants' takedown maneuver may have constituted excessive force if there was evidence Moss was complying with officers' demands, *see Herschel v. Watts*, 2018 WL 5044682 (S.D. Ind. Oct. 17, 2018), did not pose any threat, *see Rogers v. City of Harvey*, 2021 WL 1222896 (N.D. Ill. March 31, 2021), or was already subdued, *see Karkoszka v. Dart*, 2016 WL 164331 (N.D. Ill. Jan. 14, 2016). However, a clean takedown is not excessive when it is used to control an individual who poses a threat or fails to comply with an officer's demands. *See Dawson v. Brown*, 803 F.3d 829 (7th Cir. 2015) (finding no excessive force where an officer tackled a suspect's 72-year-old father because the officer reasonably believed the father was interfering with a lawful arrest and posed a threat to another officer due to his proximity to the resisting suspect); *Benter v. Jahr*, 2007 WL 128332 (W.D. Wis. Jan. 10, 2007) (granting summary judgment to the defendant on an excessive force claim where the plaintiff refused the defendant's command to stop and the defendant grabbed the plaintiff's shoulder and "decentralized" him to the ground); *Barfell v. Romanowicz*, 2016 WL 7350857 (E.D. Wis. Dec. 19, 2016) ("The officers properly escalated from a verbal request to comply to a minimum use of force to a takedown and handcuffing."); *Gay v. City of East Moline*, 2014 WL 2927046 (C.D. Ill. June 27, 2014) (granting summary judgment to the defendant officer who used a takedown maneuver on the plaintiff because he posed a safety threat and evasion risk).

Here, the undisputed record paints a scene that was tense, chaotic, dangerous, and rapidly evolving.  Moss posed an objective threat to the officers, the firefighters, and to himself by breaching the scene, barreling toward the burning home, and running towards a line of police officers. Moss was not under control and had already ignored both yellow police tape and a verbal command to stop. Under the totality of the circumstances, Defendants did not use unconstitutionally excessive force when they brought Moss to the ground.

### C.  Qualified Immunity

Because the Court has concluded Defendants did not violate Moss's constitutional rights, the analysis could end there. But, the Court believes it is prudent to discuss qualified immunity because this topic is a separate and independent basis on which the Defendants are entitled to summary judgment.

"Even when a public official's actions have violated a plaintiff's constitutional rights, the official can escape liability if the right was not clearly established at the time of the violation." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013). Once a defendant raises the defense of qualified immunity, the plaintiff bears the burden of showing the right was clearly established, *i.e.*, "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (internal quotations and citations omitted). A plaintiff can carry this burden by identifying a "closely analogous case that established a right to be free from the type of force the police officers used on him" or by showing "the force was so plainly excessive

that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Id.*

Identifying a "closely analogous case" does not mean that a plaintiff "must be able to point to a case 'on all fours'" with the facts of his own case. *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017). But he does "need to show some settled authority that would have shown a reasonable officer in [Defendant's] position that his alleged actions violated the Constitution." *Leiser v. Kloth*, 933 F.3d 696, 702 (7th Cir. 2019) (citations omitted). Or, if there is no existing precedent that puts the unlawfulness of the conduct beyond debate, a plaintiff can show this is "one of the rare cases" when the defendant's conduct "is so egregious that it is an obvious violation of a constitutional right." *Leiser*, 933 F.3d at 702.

Either way, the inquiry into whether a right is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Lovett v. Herbert*, 907 F.3d 986, 992 (7th Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). This requires courts to consider "whether the violative nature of *particular* conduct is clearly established." *Leiser*, 933 F.3d at 702 (quoting *Mullenix*, 577 U.S. at 308). Courts have been cautioned not to define the right too broadly "at a high level of generality," because "the entire second prong of qualified immunity analysis will be subsumed by the first and immunity will be available rarely, if ever." *Thompson v. Cope*, 900 F.3d 414, 421 (7th Cir. 2018) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) and *Golodner v. Berliner*, 770 F.3d 196, 206 (2d Cir. 2014)). But courts have also been cautioned not to define the right too narrowly "based on the exact factual scenario presented"

because then the government actor "will invariably receive qualified immunity." *Thompson*, 900 F.3d at 421 (citing *Golodner*, 770 F.3d at 206)).

Here, Moss argues that since there is a dispute about how much force was used, summary judgment on the basis of qualified immunity is improper. *See Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008) ("Establishing that the use of force in a particular case was 'so plainly excessive' requires a fair amount of factual development."); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) ("[I]f the facts draw into question the objective reasonableness of the police action under the alleged circumstances, they must be developed in the district court before a definitive ruling on the defense can be made."). However, Defendants argue that even after drawing all factual inferences in Moss's favor, their conduct did not violate his constitutional rights.[6] Thus, the qualified immunity determination does *not* turn on factual disputes as Moss suggests.

Moss cites district court cases to argue he had an established right to be free from the type of force Defendants used on him. *See Mitchell v. Vill. of Matteson*, 2020 WL 3035965 (N.D. Ill. June 5, 2020); *Rogers v. City of Harvey*, 2021 WL 1222896 (N.D. Ill March 31, 2021). However, "district court decisions cannot *clearly* establish a constitutional right." *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir. 1995) (emphasis in original). Further, the cases Moss points the Court to all postdate the incident in question. A plaintiff "must

---

[6] *See* Doc. 60, p. 14 ("Assuming for the sake of an argument there was interaction between William Moss and Officer Curt Hustedde at the fire scene, Officer Curt Hustedde['s] alleged use of force did not violate a clearly established right."); Doc. 58, p. 16 ("Existing law did not show it was 'beyond debate' that it was unconstitutional to takedown a bystander interfering with a fire scene.").

point to a closely analogous case decided *prior to* the challenged conduct." *Sonnleitner v. York*, 304 F.3d 704, 716 (7th Cir. 2002) (emphasis added). Nor does Moss even attempt to analogize the cases. Regardless, neither case is sufficiently similar to the case at hand.

In *Mitchell*, the officers responded to a non-violent crime and performed an "emergency takedown" on an individual who was calmly answering questions, not resisting or attempting to flee, and not agitated or threatening. 2020 WL 3035965. In *Rogers*, the officers used a takedown maneuver on an individual who was allegedly standing in line at a checkout counter, did not resist arrest, did not pose a danger to himself or others, and did not refuse to comply with orders. 2021 WL 1222896. These cases are clearly distinguishable from the circumstances here, where Moss posed an immediate risk of harm to himself and others by running past police tape and towards a line of police officers, who were attempting to protect the scene of an active fire. For all of the reasons explained above, *Mitchell* and *Rogers* did not establish a right to be free from the type of force Defendants used on Moss.

Further, when viewing the record in the light most favorable to Moss, Defendants' use of force was not so egregious that it was obviously unconstitutional. The Seventh Circuit has stated there is no clearly established rule "forbidding a clean takedown to end mild resistance[.]" *Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019). In *Johnson*, officers responded to a scene where the plaintiff arrived drunk to a rehab clinic and threatened a therapist and a security guard. *Id.* at 967. The plaintiff was handcuffed but began shouting threats and racial taunts at the officers, refused to stay seated on the ground, and started to move away from the officers while they were completing paperwork. *Id.* One of the

officers used either a kick or a leg sweep to bring the plaintiff back to the ground, and the plaintiff suffered a compound fracture. *Id.* The Seventh Circuit found the officer was entitled to qualified immunity because there was no clear rule that forbid a clean takedown of a suspect who was not under control. *Id.* at 969. The Court noted the officer did not use force after the plaintiff was returned to the ground. *Id.* Even though the plaintiff suffered a fracture, the Court stated, "Any takedown can go awry—some suspects fall clumsily, while others have fragile bones—but, if the officers use steps reasonably likely to effect a clean takedown, an injury does not lead to liability." *Id.*

Here, even according to Moss's version of events, he was not under control when Defendants brought him to the ground. Rather, he had breached police tape and was attempting to run towards a burning house where efforts were being made to put out the fire and recover two children. Moss's actions posed an immediate risk to officers, firefighters, and really everyone present.[7] Further, there is no evidence Defendants used any force against Moss after he was on the ground and subdued. Unfortunately, Moss sustained injuries that he says were caused by Defendants' use of force. However, the fact that the takedown went "awry" does not make the force unconstitutional. In fact, under the circumstances, the takedown was necessary and appropriate to protect the officers, the firefighters and their efforts, the crowd, and Moss himself. Moss has failed to

---

[7] Had Moss gotten past the firefighters and near or into the home, the consequences could have made an already bad situation worse. He would have diverted the firefighters' attention from the urgent tasks at hand: putting out the fire and searching for the two kids. This distraction, in turn, could have allowed the fire to get out of control or spread to the propane tank nearby, thus endangering everyone in the vicinity. In short, Moss's behavior posed a risk to *everyone* and had he not been subdued, his conduct would certainly have had a ripple effect.

carry his burden in response to Defendants' assertion of qualified immunity. Even if Defendants used excessive force when they took Moss to the ground, Moss's right to be free from the forced used against him was not clearly established at the time of the violation. Defendants are entitled to qualified immunity.

In sum, no one can dispute that the events that unfolded during the early morning hours of January 31, 2018 were anything but tragic. Moss found himself in a devastating situation when he learned that his niece and her children were trapped in a burning house. While resolution of the legal issues requires a careful assessment of the facts and scrutiny of the burdens of proof, it is not lost on the Court that Moss endured a traumatic experience when he suffered the loss of three family members and a physical injury, all in the course of a single day. But the fact that he suffered a physical injury does not mean Moss was the victim of excessive force. There is no evidence establishing Cleek or Hustedde's personal involvement in the takedown. And even accepting Moss's version of events, the force used was not unconstitutional, under the dangerous and rapidly developing circumstances. And even if it was, the Defendants are entitled to qualified immunity.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment filed by Mike Cleek (Doc. 56) is **GRANTED**, the Motion for Summary Judgment filed by Gabe Schimp and Ryan Ward (Doc. 58) is **GRANTED**, and the Motion for Summary Judgment filed by Curt

Hustedde (Doc. 60) is **GRANTED**. Plaintiff's claims against Defendants are **DISMISSED with prejudice**. Judgment will be entered in their favor at the conclusion of this case.

**IT IS SO ORDERED.**

**DATED: May 6, 2022**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**